# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEASTERN DIVISION

| | |
|---|---|
| **DERRICK JUSTIN CHOATE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | No. 2:16-cv-00069 |
| ) | Chief Judge Crenshaw |
| **PHIL ARMS,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM

This case lends support to the saying that there are two sides to every story. It could also prove the adage that a picture is worth a thousand words, if only the video camera had captured on film the alleged mistreatment inmate Derrick Choate received at the hands of jailer Phil Arms. Unfortunately it did not, prompting Magistrate Judge Joe B. Brown to recommend denial of Arms' Motion for Summary Judgment (Doc. No. 24).

Having conducted the *de novo* review required by Rule 72(b) of the Federal Rules of Civil Procedure, the Court agrees with Magistrate Judge Brown's Report and Recommendation ("R & R") (Doc. No. 89). Accordingly, the Court will deny the Motion for Summary Judgment and overrule Arms' objections to the R & R, which are presented in the form of a Motion for *De Novo* Determination (Doc. No. 91).

## I. Background

On January 14, 2016, Choate was a pretrial detainee in the Putnam County Jail. Arms, a lieutenant with the Putnam County Sheriff's Department[1] who worked at the jail, claims that Choate– convicted felon jailed on charges of felony evading arrest, and an avowed member of the

---

[1] Arms has since been promoted to Captain. (Doc. No. 24-1, Arms Aff.).

Aryan Nations–"escaped from his maximum-security cell" and "refused to return." (Doc. No. 92 at 2). As jailers were escorting Choate to a holding cell, he turned "180º" to face Lt. Arms and told him that he would have Lt. Arms' wife and mother "f**ked with a n**ger d*ck," or words to that effect. (Id. at 3). Because Choate turned around and made verbal threats, Lt. Arms believed that Choate "posed a significant disciplinary threat." Acting on the threat, Lt. Arms grabbed Choate and "put him against the wall." (Id.). Lt. Arms concedes that Choate "bump[ed] his head," but claims this resulted in an "inconsequential small knot." (Id.).

Lt. Arms' Motion for Summary Judgment is supported by his own affidavit (Doc. No. 24-1) and the affidavits from several correctional officers (Doc. Nos. 24-3, 24-4, 24-5) who were on scene. These affidavits generally state that, after Choate turned and threatened Lt. Arms, Choate was "put" or "taken" to the wall by Lt. Arms, which resulted in a superficial knot on Choate's forehead. They also uniformly opine that the force Lt. Arms used was not excessive.

In addition, Lt. Arms relies upon the affidavit of Deborah A. Deck, L.P.N.[2] In her affidavit, Nurse Deck states:

> Based upon my assessment of Mr. Choate, it was my opinion that he had a small lump on his head that resolved without any significant problems. When I initially saw him the first two times, he had no marks on his neck and did not complain about any marks on his neck until the second time I saw him. At that time, there were no marks seen on his neck. The third time I saw him there were marks. It would be very unusual for marks to appear three (3) hours after I initially observed him if they had been placed on him before 9:30 a.m. when he was initially seen.

(Doc. No. 52-1 at 2-3).

For his part, Choate alleges that, on the day in question, he did not know he was on

---

[2] Lt. Arms characterizes Nurse Deck as an "independent" witness. (Doc. No. 92 at 2). While she may be an "employee of Southern Health Partners, an independent medical company," (id. at 6), it is unlikely that Southern Health Partners provides free medical care to the inmates at the Putnam County Jail, or that Nurse Deck works *gratis.*

2

lockdown. He also claims not to remember whether he or his cellmate opened the cell door, but asserts that the locks on the cells had been broken for years, and inmates entered and exited their cells at will, even if they were not supposed to. Choate claims that, as he was being escorted out of the housing unit, he turned the upper half of his body "about 60 to 90 degrees" while still walking forward, and told Lt. Arms to "go f**k your mother in the ass with a n**ger d*ck." (Doc. No. 60 at 2). This statement, he claims, was not a threat to either Lt. Arms or his family, but Lt. Arms "became enraged about the comment." (Id. at 3). Lt. Arms then allegedly "grabbed" Choate "around the neck with both hands," threatened to kill him, and "choked" Choate "for a period of time to an almost unconscious state." (Id.). After that, Lt. Arms allegedly "slammed [Choate's] head into the wall . . . while [Choate] was handcuffed . . . and not resisting in anyway." (Id.). The net result of Lt. Arms excessive use of force, according to Choate, was that he "received an extremely large knot to the right front part of [his] forehead," and had "strangulation and claw marks to [his] neck." (Id. at 3).

To support his version of events, Choate submitted his own affidavit (Doc. No. 71), along with affidavits from Derrick Flores (Doc. No. 61), Shawn Vincent (Doc. No. 62), James Whittenburg (Doc. No. 71), and Christopher Mayberry (Doc. No. 74), all fellow inmates at the Putnam County Jail. Collectively, those affidavits suggest the following: (1) a handful of inmates were sitting around a table in the day room playing cards when they were approached by several guards; (2) at the guards' instructions, Choate stood up and was handcuffed; (3) while being led away, Choate said something pejorative about Lt. Arms' mother or wife pertaining to a "n**ger d*ck," but this was in response to guards inviting Choate to fight, Lt. Arms' statements to the effect that Choate was a "punk," and that he ate guys like Choate for breakfast; and (4) Lt. Arms choked

3

Choate and slammed his head into the wall (some say on more than one occasion). At least two of the affiants also claim to have seen a large knot on Choate's forehead after the altercation with Lt. Arms.

The "escape" from the "maximum security cell" and some of the subsequent events were captured on video. Although the video lasts 7 minutes and 39 seconds, it appears (based upon the counter at the bottom of the screen) to encompass the period from 8:38 a.m. to 9:01 a.m. on June 24, 2016.[3] Approximately one minute into the video, a hand and arm can be seen protruding through the pie hole in the door of a cell that sits towards the back of the pod. Approximately fifty seconds later, as inmates are casually walking down the stairs towards a table at the back of the pod and directly in front of Choate's cell, Choate and his cellmate are seen exiting their cell. They then walk over to the same table and sit down. For the next five minutes based on the video, or twenty minutes based on the counter, Choate appears to be chatting with five to six individuals that are sitting at, or standing near, the table. Two jailers then approach and position themselves on opposite sides of the table. They are joined by another jailer.

At six minutes into the tape, or twenty-one minutes according to the counter, five jailers are positioned around the table. After what appears to be a brief discussion, Choate stands up and is handcuffed from behind. Accompanied by jailers, Choate then walks to the left side of the common area, along the cellblock doors. At one point Choate turns to face Lt. Arms. Lt. Arms then appears to push Choate and the two, along with a jailer who was following them, disappear behind a staircase and are off screen for the next 19 seconds. Seven minutes and fifteen seconds into the tape,

---

[3] The difference in the time, *i.e.* the 7-plus minutes on the tape provided to the Court versus the 23 minutes which appears to have elapsed based upon the timer, may be the result of the tape being turned-off or fast forwarded when it was copied. There is no suggestion, however, that the tape was altered to leave out critical events.

4

or at 9:51 a.m. according to the counter, Choate and his jailer escorts reappear on screen for a few seconds and then disappear once again.

### III. Legal Analysis

In his Motion for Review, Lt. Arms argues that he is entitled to summary judgment or, at the very least, qualified immunity on Choate's excessive force claim because Choate cannot show that a clearly established right was violated. He further claims that (1) Magistrate Judge Brown "did not properly analyze this case" in accordance with Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015), (2) the videotape and the affidavits filed on behalf of Lt. Arms show no excessive force was used; and (3) Choate has only shown there might be some "metaphysical doubt" as to the material facts, making summary judgment appropriate. The Court is unpersuaded by any of these arguments.

As a preliminary matter, Lt. Arms is correct that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the constitution. Graham v. Connor, 490 U.S. 386, 396 (1989). Rather, and as the Supreme Court recently pointed out, the following considerations may prove relevant to a determination of excessive force: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley, 135 S. Ct. at 2473.

Here, the evidence in inconclusive. While Lt. Arms claims he was handling an escape from a maximum security cell, the video shows Choate and others firmly ensconced in the housing unit, playing cards, and chatting for quite some time before officers arrived to corral the alleged escapees. Further, while Lt. Arms claims that Choate posed a severe threat, that is not evident from the video

5

on which he so heavily relies, even though it shows that, at one point, Choate turned to face Lt. Arms.

Lt. Arms also argues that "[n]o case has held that it is unconstitutional for a prison guard, confronted and threatened as Lt. Arms was, to take a prisoner to the wall and then a holding cell," and claims Choate simply "bump[ed] his head and received an inconsequential small knot." (Doc. No. 92 at 2). These assertions fail to acknowledge that Choate claims that his head was slammed against the wall resulting in a large knot, and that he was choked almost to the point of unconsciousness. They also ignore that the Sixth Circuit has (1) "long recognized that a spontaneous assault by a prison guard on an inmate is grounds for an Eighth Amendment excessive force claim," (2) "long held that a plaintiff may 'allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage,'" and (3) recognized "that pretrial detainees ha[ve] a clearly established right not to be gratuitously assaulted while fully restrained and subdued." Coley v. Lucas Cty., 799 F.3d 530, 538 (6th Cir. 2015) (citation omitted) (collecting cases).

To prevail on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley, 135 S. Ct. at 2473. Choate has presented sufficient evidence to at least raise a jury question on the issue, notwithstanding Lt. Arms' opinion that the video shows otherwise.

Lt. Arms relies on the Supreme Court's decision in Scott v. Harris, 550 U.S. 372, 380 (2007) for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." He also relies on

the Sixth Circuit's decision in Kinlin v. Kline, 747 F.3d 573, 576 (6th Cir. 2014), which confirms the point.

The Court cannot say, in the words of Scott, that "the videotape tells quite a different story," 550 U.S. at 379, from that narrated by Choate and his fellow detainees. The videotape actually tells no story for 19 seconds and it is during that period when the alleged excessive force occurred. See Godawa v. Byrd, 798 F.3d 457, 463 (6th Cir. 2015) (citation omitted) (noting that Scott was based on a "videotape that captured the relevant events and 'quite clearly contradict[ed]' the plaintiff's story such that 'no reasonable jury could believe it.'"); Gholston v. Wayne Cty. Airport Auth., 574 F. App'x 632, 637 (6th Cir. 2014) (stating that "Scott is applicable only if there are objective facts in the record, such as a video, showing that one party's account is simply beyond belief"); Landis v. Phalen, 297 F. App'x 400, 405 (6th Cir. 2008) (citation omitted) (observing that Scott requires summary judgment only where plaintiff's store is "utterly discredited" by a videotape).

Nor can the Court reject the affidavits of Choate's witnesses simply because some say that Choate only partially turned, whereas the tape show he made a total about-face. *Falsus in uno, falsus in omnibus* (false in one, false in all), while perhaps "a natural and instinctive tool of the *factfinder*, like a carpenter's hammer or plumber's wrench," Siewe v. Gonzales, 480 F.3d 160, 171 (2d Cir. 2007) (emphasis added), is a "hoary doctrine," United States v. Connolly, 504 F.3d 206, 216 (1st Cir. 2007), of dubious validity. "[T]he fact that a witness lies about one thing doesn't automatically invalidate all his testimony." United States v. Edwards, 581 F.3d 604, 612 (7th Cir. 2009) (collecting cases); see United States v. Jackson, 69 F. App'x 630, 632 (4th Cir. 2003) ("Courts disfavor such an instruction and prefer general instructions on witness credibility"). Indeed, "[a]nyone who has ever tried a case or presided as a judge at a trial knows that witnesses are prone

7

to fudge, to fumble, to misspeak, to misstate, to exaggerate. If any such pratfall warranted disbelieving a witness's entire testimony, few trials would get all the way to judgment." Kadia v. Gonzales, 501 F.3d 817, 821 (7th Cir. 2007).

Furthermore, the affiants' testimony about how far Choate turned his body is not necessarily an untruth. Choate was followed by Lt. Arms and another guard and it could be that from their vantage point those witnesses only saw what appeared to be Choate turning his head or upper body.[4]

Lt. Arms also argues the videotape confirms that nothing untoward occurred while he and Choate were outside of camera range because when Choate and the officers reappear, Choate is "calmly being led toward the holding cell," he "and the Corrections Officers are all calm," "[t]here is no agitation, whatever," "[n]o one is animated," and "[n]o one is disheveled." (Doc. No. 92 at 5). That is certainly one way to view the film. On the other hand, the record also contains a videotape of a cell extraction later that afternoon and some of the stills from the video (*e.g.* Doc. Nos. 94-1 at 2 and 94-2 at 3) might be viewed by the jury as showing that Choate has a large knot on the right side of his forehead, which is exactly the injury that he claims to have received.

Finally, Lt. Arms is correct that "some metaphysical doubt as to a material fact is insufficient to forestall summary judgment." Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) (citing Sierra Club v. ICG Hazard, LLC, 781 F.3d 281, 284 (6th Cir. 2015)). However, in the absence of a conclusive videotape, to accept his premise that there is only a metaphysical doubt about whether he used excessive force against Choate would be to credit Lt. Arms' witnesses over Choate's witnesses simply because the former are correctional officers and a nurse, while the

---

[4] The Court recognizes that if the view of one or more of the inmates was obscured, then they also might not have been able to witness what occurred once Choate and Lt. Arms were off screen. This is not evident from their affidavits, however, and is something that can be explored on cross-examination.

latter are (or were) inmates, some of whom are convicted felons. This, the Court will not do. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); United States v. Daniels, 170 F. App'x 409, 413 (6th Cir. 2006) (observing that it is "the proper role of the jury to determine the believability" of witnesses). Although "convicted felons are not generally permitted to stand pristine before a jury with the same credibility as that of a Mother Superior," United States v. Lipscomb, 702 F.2d 1049, 1077 (D.C. Cir. 1983) (McKinney, J. concurring), Rule 601 of the Federal Rules of Evidence provides that "[e]very person is competent to be a witness unless these rules provide otherwise," and Rule 609 sets forth the general rule for "attacking a witness's general character for truthfulness by evidence of a criminal conviction[.]" Fed. R. Evid. 601, 609(a).

### III. Conclusion

Based upon the foregoing, the Court will adopt Magistrate Judge Brown's R & R, overrule Lt. Arms' objections thereto, and deny his Motion for Summary Judgment.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE